## LOHMULLER v. LOHMULLER.

(Court of Civil Appeals of Texas. March 15, 1911.)

1. DIVORCE (§ 27*)—GROUNDS—CRUELTY—DENIAL OF CONJUGAL RIGHTS.

The refusal of a nervous and delicate wife, who would probably die under childbirth, to engage in sexual intercourse with her husband save upon certain conditions which would not injure him, but would protect her, does not constitute "excesses, cruel treatment, or outrages" sufficient to award a divorce.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 73, 74; Dec. Dig. § 27.*]

2. DIVORCE (§ 27*)—GROUNDS—CRUELTY—REFUSAL OF CONJUGAL RIGHTS.

The unjustifiable refusal of a spouse to engage in sexual intercourse for a long time is not necessarily ground for divorce, unless it injures the health.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 73, 74; Dec. Dig. § 27.*]

3. DIVORCE (§ 116*)—PROCEEDINGS—EVIDENCE—ADMISSIBILITY.

Where a husband testified his wife mistreated him and used harsh language, she, in order to explain this and show reasons for her jealousy and distrust, should have been allowed to show that this happened after the husband

---

told her he had ceased to love her, and had been seen buggy riding at night with another woman.

[Ed. Note.—For other cases, see Divorce, Dec. Dig. § 116.*]

**4. DIVORCE (§ 184*)—APPEAL—EVIDENCE.**

In divorce suits, the decree depends on the judgment of the court, and not the verdict of the jury, and on appeal the court must be convinced that the evidence is full and satisfactory.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. § 572; Dec. Dig. § 184.*]

**5. DIVORCE (§ 127*)—EVIDENCE—SUFFICIENCY.**

A divorce cannot be granted upon the uncorroborated testimony of the one seeking it.

[Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 403–407; Dec. Dig. § 127.*]

Appeal from District Court, Bexar County; Edward Dwyer, Judge.

Suit for divorce by Bernhard Lohmuller against Elsie Lohmuller. From a judgment for plaintiff, defendant appeals. Reversed.

Wm. Aubrey, for appellant. D. J. Powell, for appellee.

FLY, J. This is a suit for divorce instituted by appellee against his wife, who is the appellant herein. The cause was submitted to a jury, and resulted in a verdict for a divorce in favor of appellee, upon which the court rendered a judgment dissolving the bonds of matrimony between the parties, and awarding the custody of Lucile Ursula Lohmuller, aged nine years, and William J. Lohmuller, aged six years, their children, to the appellant, their mother.

If an object lesson were needed to show the vicious and degrading effects of the act of 1897, which with ruthless hand swept aside the beneficent rule tested by the wisdom of ages that neither husband nor wife should be allowed to testify in a suit for divorce, this would furnish it. But in line with modern thought that makes the marriage contract a trivial affair, to be set aside for the most frivolous reasons, the dragon's teeth were sowed, and the courts are being made the outlets of the most disgusting details of the inner lives of married people, homes are being disorganized and broken up, children branded with disgrace, and the most sacred relation on earth made a subject of ribaldry and ridicule in a way that is polluting the fountains of American society. The floodgates of scandal and disgrace were opened up by the Legislature of Texas, in the face of the solemn warnings of the wisest and best men on the bench who have written on the subject. In the case of Stafford v. Stafford, 41 Tex. 111, Mr. Justice Devine, speaking for the court, said: "To allow the husband and wife to give evidence in their divorce suit would not only loosen, weaken, and most injuriously affect the marriage tie, but would greatly tend to destroy or impair that unreserved confidence which exists between husband and wife, and which the wisdom of centuries has sought to preserve by preventing them from testifying against each other (saved a limited exception)." But the statute of 1897 set aside the common-law rule, invaded the sanctity of the home, impaired the vitality and solemnity of the marriage contract, and made possible the disgusting disclosures found in this case. We are confronted with the statute, and the courts can do nothing save to minimize as far as is consistent with their duties the blighting effects of the law.

The uncontradicted evidence showed that appellant was a nervous, frail woman, who would probably die if she bore another child, and appellee was fully advised of that fact by the family physician, and he was also told that he should not demand that his wife submit to his embraces, except under certain conditions, which condition appellee stated rendered him nervous and made him sick, but which the only physician who testified stated could not and did not injure him; in fact, could have no hurtful effect whatever. Appellee stated that under the conditions prescribed by the physician he lived with his wife from some time in 1905 until 1909, when he abandoned her and instituted this suit. He stated that the happy period of his married life ended shortly after the birth of the last child in 1905, but the affectionate letters written by him to his wife in July, 1908, when he applied the most endearing terms to her, and seemed to be brimming over with love and affection for her, render the statement unworthy of belief, and it was only in December, 1908, that "a change came over the spirit of his dreams," and he endeavored to obtain his wife's consent to a separation, and it appears that about that time his chivalrous feelings in connection with other women were aroused to such a degree that he had to escort them from their places of business to their places of abode, and incidentally, on one occasion, at least, he had "a nice little drive" with one woman after night's shadows had fallen upon San Antonio. Of course, he meant no harm by this, but very naturally such matters were not calculated to produce a state of hilarity, or feelings of composure, in his wife. Appellee not only revealed the most confidential matters that occurred between him and his wife, but testified that she sought to attack him with a gun, which was shown never to be loaded, and that she had threatened to poison him. All these threats were made according to appellee just before he abandoned his wife. He admitted that four or five months before he abandoned his wife his "love turned against her," and it is uncontradicted that he told her about it, and it is only natural that it should excite her and render her suspicious and jealous of him. And yet amidst all the contumely and reproach and threats and attacks on his person this model husband testified that he

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

"never lost his temper," but insisted on doing things, which, he stated, at the time he believed would result in the death of his wife. While he stated that he believed his wife "is a murderess by the lowest, meanest, and most cowardly method, by poison," yet he was willing that she have the custody and rearing of his daughter and son. He closed his testimony by the admission that "the real and substantial cause of difference between me and my wife, and cause of all this trouble between us has been, not all altogether, that she would not submit to risk her life to gratify my passion. That very thing was the beginning and end of all the difficulty, and that's the cause." The evidence of appellant's mother was mostly hearsay and really amounted to nothing.

The refusal to accede to the passion of a man who knew that childbearing would destroy the life of his delicate, nervous wife, and who was unwilling to inconvenience himself in any way to prevent such a catastrophe, would not constitute such "excesses, cruel treatment, or outrages" toward him as would entitle him to a dissolution of the marriage ties. Even an unjustifiable refusal of marital rights is not necessarily a cause for divorce, and when there is no refusal but merely certain conditions are prescribed which cannot injure the husband, but will protect the wife from probable death, the divorce should not be granted. Varner v. Varner, 35 Tex. Civ. App. 381, 80 S. W. 386. The testimony of appellant showed that the sole ground for the divorce was a refusal upon the part of the wife to sacrifice herself to his sensual desires, and it has been uniformly held that a denial of sexual intercourse of itself, even when persisted in for a long time, will not be a ground for divorce, unless it injures the health, which fact has never been established. Stewart v. Stewart, 78 Me. 548, 7 Atl. 473, 57 Am. Rep. 822; Southwick v. Southwick, 97 Mass. 327, 93 Am. Dec. 95; Cowles v. Cowles, 112 Mass. 298; Burton v. Burton, 52 N. J. Eq. 215, 27 Atl. 825; Watson v. Watson, 52 N. J. Eq. 349, 28 Atl. 467. Speaking of the marital duties, the Supreme Court of Maine in the case cited of Stewart v. Stewart held: "Sexual intercourse is only one marital right or duty. There are many other important rights and duties. The obligations the parties assume to each other and to society are not dependent on this single one. Many of these obligations—fidelity, sobriety, kind treatment, etc.—have legal sanctions, and can be enforced, or their breach remedied by legal process. This obligation in question is of a nature so personal and delicate, and dependent so much on sentiment and feeling, that the English ecclesiastical courts, though reaching far into the privacy of domestic life, have stopped short of this." Better far would it have been for the good of the morals of society, and for the sanctity of the

home and the marital relations, that the husband or wife had never been permitted to tear asunder the veil of marital privacy, and permit the gaping multitude to gaze upon its tenderest and most delicate secrets. In this case, however, there has been no denial of any marital right, or the failure to perform any marital duty, but merely a request by the wife for him to accede to simple conditions that would tend to protect the health and shield the life of a delicate wife. This was the head and front of her offending, or, in the language of appellant, the trouble was "that she would not submit to risk her life to gratify my passion in the way I wanted."

The ill treatment and harsh language testified to by appellee, and in some particulars by his mother, were not known by the most intimate friends and relatives, according to the record, but in order to show a reason for any accusations on the part of the wife, and to explain her jealousy and distrust of her husband, who had informed her of his dead love for her, she ought to have been permitted to prove by the witness Dullnig that he had seen appellant in a buggy with a woman, not his wife, after night, and that he had communicated that fact to the wife. So jealously has the marriage contract been guarded by the laws of Texas that judgments by default are not to be tolerated, nor the want of an answer be construed as a confession of the truth of the allegations in the petition, "but the decree of the court shall be rendered upon full and satisfactory evidence." Article 2979, Rev. St. 1895. This requirement should be jealously enforced by the courts of the country, and there should be more caution and scrutiny of the facts and circumstances in this day of "affinities" when the barriers of the common law have been destroyed and husband and wife have been given unbridled license in testifying against each other in cases of divorce. As said by the great Hemphill in Sheffield v. Sheffield, 3 Tex. 79, in discussing the marital relation, which should be kept in view in every divorce trial in the state of Texas: "The nature, object, and important purposes of the contract should have their just influence upon the mind. The parties have pledged themselves, not only for their own happiness, but for purposes important to society, to live together during the term of their natural lives. This engagement is the most solemn and important of human transactions. It is regarded by all Christian nations as the basis of civilized society, of sound morals, and of domestic affections; and the relations, duties, obligations, and consequences flowing from the contract are so important to the peace and welfare of society as to have placed it under the control of special municipal regulations, independent of the will of the parties. The mutual comfort and happiness of the parties are the principal, but not the only, objects of the engagement. It is intended, also, for the

benefit of their common offspring, and is an important element in the moral order, security, and tranquility of civilized society. The parties cannot dissolve the contract, as they can others, by mutual consent, and no light or trivial causes should be suffered to effect its rescission. While full effect is to be given to the statute, it should be remembered that according to the experience of the most enlightened nations the happiness of married life greatly depends on its indissolubility, and that the prospect of easy separation foments the most frivolous quarrels and disgusts into deadly animosities. Parties may not be able to live together very harmoniously, but they cannot be separated except for reasons approved of by law. And when they know they must live together, except for causes prescribed by the law, they learn, in the language of Lord Stowell, 'to soften by mutual accommodation the yoke which they know they cannot shake off; they become good husbands and wives from the necessity of remaining good husbands and wives; for necessity is a powerful master in teaching the duties it imposes.' Such construction ought to be given the statute, and such weight allowed the acts of the parties, as would effect the legislative intention; but there should not be such looseness of exposition as would defeat the beneficial objects of the marriage institution, and sunder its bonds with almost as much facility as if it were a state of concubinage, dependent alone on the will of the parties."

At least four of the jury seem to have held the idea that the marriage relation should be dissolved whenever the parties are willing to throw it off, and they even went further and found in favor of dissolution of the marriage for the reason that appellee was dissatisfied with his wife, because in an affidavit attached to the motion for new trial they stated that "they did not believe from the evidence in said cause that defendant had been guilty of cruelty and excesses to her husband, but that they, in good faith, believed that said parties would not come together as husband and wife." The affidavit of the jurors, the use of which is justified perhaps by the statute (Acts of 1905, p. 21) as part of a motion for new trial, shows an utter disregard of the evidence and a verdict based on matters of opinion which had no place in the case.

Giving full force and effect to the evidence of appellee and his mother in regard to the threats of his wife, the testimony is insufficient to justify a divorce. All of those matters came after he had refused to cohabit with his wife, and after he had lost his love for her and had told her about it, and they were the natural offspring of his inexcusable conduct. With it all he testified she was not a wicked woman, and with it all he was willing to intrust the welfare and

happiness of his young children to her care. Even if the acts complained of had not been provoked by appellee, they were not sufficient to constitute grounds for a divorce. Adams v. Adams, 78 Tex. 191, 14 S. W. 452. In suits for divorce the same respect is not required for the verdict of a jury as in other cases, and the trial judge in decreeing a divorce does not proceed upon the verdict, but upon his own judgment, and, when the cause reaches this court, it too must be convinced that the evidence is "full and satisfactory," before it will affirm a judgment. Moore v. Moore, 22 Tex. 237. And, when a judgment for divorce depends largely, if not altogether, upon the testimony of the spouse seeking the divorce, a decree dissolving the bonds of matrimony will not be granted unless the other facts and circumstances tend to corroborate his or her testimony. Seago v. Seago, 64 S. W. 941.

The record shows a full development of the evidence in the case, and, deeming it insufficient to justify a decree of divorce, the judgment will be reversed and judgment here rendered that appellee take nothing by his suit, that a divorce be denied, and that he pay all costs of this suit.