**KNIGHT v. KNIGHT.   (No. 6387.)**

(Court of Civil Appeals of Texas.   San Antonio.   April 7, 1920.)

**1. Divorce ⬳127(1) — Evidence of parties must be full and satisfactory.**

The statute permitting husband and wife to testify against each other in proceedings for divorce did not repeal the statutory requirement that the evidence, to entitle to a divorce, must be full and satisfactory, and the testimony of the parties should be scrutinized more cautiously.

**2. Divorce ⬳127(3)—Suspicious testimony by husband, not corroborated as it might have been, is insufficient.**

Where the husband's testimony in his proceeding for divorce was such as to arouse suspicions as to its truth, and was not corroborated by other evidence as to matters which might have been shown, if true, it was not sufficient to entitle him to a divorce, even though uncontradicted.

**3. Divorce ⬳37(22)—Actions by husband held to justify wife's abandoning him.**

Indecent proposals by a husband to his daughter-in-law *held* sufficient to justify his wife in abandoning him, so that he could not secure divorce for desertion.

**4. Divorce ⬳49(5)—No condonation by wife in visiting home.**

A wife's return to home of her husband, without resuming cohabitation, but merely for the purpose of investigating whether her suspicions concerning his adultery were justified, and which resulted in confirming those suspicions, so that she again left, was not a condonation of his offense.

**5. Divorce ⬳127(1)—Court can disregard undisputed evidence of parties.**

Especially in divorce cases, under Rev. St. art. 4633, empowering the court trying a divorce case, where the husband or wife testified, to determine credibility of such witness and the weight to be given such testimony, the court can disregard the uncontradicted testimony of the husband, suing for divorce.

Appeal from District Court, Brooks County; V. W. Taylor, Judge.

Suit for divorce by Frank H. Knight against Lillie E. Knight. From a decree denying divorce, plaintiff appeals. Affirmed.

Kleberg, Stayton & North, of Corpus Christi, for appellant.

FLY, C. J. Appellant sued to secure a divorce from his wife, the appellee, on the ground of three years' voluntary abandonment, without cause or provocation on his part. Appellee answered by a general denial, and further that, in the event that a divorce was granted, she would accept certain property as her portion of the estate as offered by appellant. The court denied the divorce.

The only evidence offered in this case came from appellant, who was seeking a divorce from his wife, and he disclosed, on cross-examination by the court, that his wife was an excellent Christian woman, who had been informed and believed that he was guilty of adultery. He said:

"Well, she had provocation, I presume. She claimed I had committed adultery, and she said 'Confess! confess!' and I said, 'Lillie, I have not; I have not; I can't confess.'"

His evidence showed that appellee was unwilling to condemn him, without an investigation, and that she left their home, and went to the ranch, where he was staying, and the belief that he was an adulterer grew on her mind, by her association with him on the ranch, and, to use the strong language of the witness, "Why, hell was to pay all the time." He not only disclosed the fact that his wife suspected him, but that his children indulged in the same suspicion. No witness, except himself, testified to his uprightness and innocence of the offense alleged against him. Although he testified to the cleanliness of his life and actions, yet he admitted that he—

"couldn't just tell her the truth, deny it, and it just weighed on her mind, with the assistance she got from her children, apparently."

He denied the truth of her charges against him, but he admitted that, when his son married a second time and brought his wife to the ranch, he had made improper and insulting proposals to her; his reason, as he swore, being that he suspected her virtue and wanted to test her. He testified:

"Yes; my son had married this woman; it was his wife, and the son said I was guilty of adultery; that is, not with his wife, but with Mexicans; and the Mexicans said I was guilty; that's what she said; and they told my wife, and this son's wife, she was always on hand to see the row, and always seemed to take delight in seeing the row between the wife and the son and myself."

Appellee went to the ranch after she had been told of the indecent proposal made to the daughter-in-law, to see if she could run things better; but she evidently was satisfied that matters had gone so far she could do nothing, and she left. When asked what transpired between appellant and his daughter-in-law, he answered:

"Well, the thing of it—the conduct was such as between me and the woman would lead up to sexual intercourse."

While it was sought by questioning to get him to say that his "sole and only object" in making indecent proposals to his son's wife was to see if she was a lewd woman, yet he hesitated and said, "That was, I think, the only object;" and again he said, "I don't want to say 'yes,' but it is 'yes' in my heart." When asked if she had acceded to his request, if he would have gone further, he answered, "I believe not; no; no, sir." He might have been uncertain as to what he might have done; but it appears that his wife was not, after being with him on the ranch and having him under her scrutiny. His testimony showed that his wife abandoned him after having been informed of his acts of adultery and his conduct with his daughter-in-law, and after she had investigated for herself.

[1] Under the law as passed in 1897 (Acts 1897, c. 49), the old rule, from which had flowed such beneficent results, not permitting either spouse to testify against the other in a divorce suit, was destroyed, and since that time the marriage relation has been set aside with increasing frequency by the testimony, without the slightest corroboration, of either party to the marriage contract; but the Legislature, while allowing the destruction of the contract to rest with the conscience of either party, did not repeal that requirement of the statute that prohibits the annullment of a marriage except "upon full and satisfactory evidence." The evidence must first be "satisfactory" to the trial judge, and, if appealed, it must then be deemed by the appellate court to be "full and satisfactory." Lohmuller v. Lohmuller, 135 S. W. 751. As said in that case:

"This requirement should be jealously enforced by the courts of the country, and there should be more caution and scrutiny of the facts and circumstances in this day of 'affinities,' when the barriers of the common law have been destroyed, and husband and wife have been given unbridled license in testifying against each other in cases of divorce."

If that language was appropriate nine years ago, when used by this court, it has become necessary and more appropriate now, when there is a perfect carnival of separations, and marriages and divorces are running neck and neck.

The language of Chief Justice Hemphill, in Sheffield v. Sheffield, 3 Tex. 79, written over 70 years ago, is just as golden, just as true to-day, and cannot be too strongly or too often emphasized:

"The nature, object, and important purposes of the contract should have their just influence upon the mind. The parties have pledged themselves, not only for their own happiness, but for purposes important to society, to live together during the term of their natural lives. This engagement is the most solemn and important of human transactions. It is regarded by all Christian nations as the basis of civilized society, of sound morals, and of the domestic affections; and the relations, duties, obligations, and consequences flowing from the contract are so important to the peace and welfare of society as to have placed it under the control of special municipal regulations, independent of the will of the parties. The mutual comfort and happiness of the parties are the principal, but not the only, objects of the engagement. It is intended also for the benefit of their common offspring, and is an important element in the moral order, security, and tranquility of civilized society. The parties cannot dissolve the contract, as they can others, by mutual consent, and no light or trivial causes should be suffered to effect its rescission. While full effect is to be given to the statute, it should be remembered that, according to the experience of the most enlightened nations, the happiness of married life greatly depends on its indissolubility, and that the prospect of easy separation foments the most frivolous quarrels and disgusts into deadly animosities. Parties may not be able to live together very harmoniously, but they cannot be separated except for reasons approved of by the law. And when they know they must live together, except for causes prescribed by the law, they learn, in the language of Lord Stowell, 'to soften, by mutual accommodation, the yoke which they know they cannot shake off; they become good husbands and wives from the necessity of remaining husbands and wives; for necessity is a powerful master in teaching the duties it imposes.' Such construction ought to be given the statute, and such weight allowed the acts of the parties, as would effect the legislative intention; but there should not be such looseness of exposition as would defeat the beneficial objects of the marriage institution, and sunder its bonds with almost as much

facility as if it were a state of concubinage, dependent alone on the will of the parties."

[2, 3] The law has unfortunately made it possible for one party to a marital contract to secure a divorce from the other on his or her own testimony; but when there is nothing to corroborate such testimony, although there are points in it on which any man of untarnished reputation could find corroboration, and when the testimony of the party himself is calculated to raise a suspicion as to his character, and tends to show that the wife had not voluntarily abandoned her husband, but was compelled by her own self-respect so to do, the evidence cannot be held to be "full and satisfactory." The fact that he had made indecent proposals to the young wife of his son was sufficient to justify her in abandoning him.

[4] The evidence failed to show cohabitation with her husband when she went to the ranch, and there is no evidence of condonation of the offense. She was, according to his testimony, firmly convinced of his bad conduct all the time she was at the ranch. She was convinced he was an adulterer and that conviction "grew on her mind and weighed on her mind." The plain inference is that his acts while she was at the ranch convinced her of the truth of the charges against him. His testimony showed nothing like condonation, but, on the other hand, showed that "hell was to pay all the time."

[5] The court had the witness before him, probably knew him, and could judge of the truth of his testimony. He rejected his excuses for his outrageous conduct towards his daughter-in-law, as he had the right to do, and rejected his denial of his adultery with Mexicans, as he had the right to do. This is the rule in all cases, but it is emphasized in article 4633, Revised Statutes, which renders parties to a divorce suit competent to testify, by the provision that—

"Where the husband or wife testifies, the court or jury trying the case shall determine the credibility of such witness, and the weight to be given such testimony."

The court discredited the testimony of appellant, as he was fully authorized to do, and denied a divorce. This court has so held heretofore. Seago v. Seago, 64 S. W. 941.

The judgment is affirmed.

